

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

July 25, 2025

**BY ECF and EMAIL**
The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Tabitha Bundrick*, 24 Cr. 313 (JGK)

Dear Judge Koeltl:

    The Government respectfully submits this letter in advance of the July 30, 2025, sentencing of the defendant Tabitha Bundrick.

    Over the course of only ten months, between April 2023 and February 2024, the defendant killed three innocent victims: Mario Paullan, Miguel Angel Navez Ramirez, and Abrihan Rofer Fernandez Rodriguez. She killed those victims by intentionally providing them with fentanyl to incapacitate them so that she could rob them. While she may not have specifically intended to kill her victims when she drugged them with fentanyl—as opposed to just temporarily incapacitate them—she knew that the fentanyl she provided her victims *could* kill them and she gave it to them anyway. More than that, the defendant knew that the men she was giving fentanyl to were, *in fact*, dying, but she continued to drug more men. That was all but murder.

    For that abhorrent conduct, the defendant faces a Guidelines range of 210 to 262 months' imprisonment and has agreed not to seek a sentence below ten years' imprisonment. A ten-year sentence, however, is far from sufficient. Because of (i) the seriousness of the defendant's conduct and the need to provide just punishment for the offense, (ii) the need for specific deterrence and the need to protect the public, and (iii) the need for general deterrence and to promote respect for the law, the Court should impose an above-Guidelines sentence of 30 years in prison—ten years in prison for each victim that the defendant killed.

    The Government does not make this recommendation lightly. The defendant is an extraordinarily dangerous individual whose deliberate indifference to the lives of others demands a sentence that will incapacitate her until she reaches an age when she poses less of a danger to the public.

I. **Background**

A. **Offense Conduct**

Between April 30, 2023 and February 25, 2024, the defendant distributed fentanyl and other controlled substances to three different male victims—Mario Paullan, Miguel Angel Navez Ramirez, and Abrihan Rofer Fernandez Rodriguez—at various locations in Manhattan. (PSR ¶ 9). On each of those occasions, the defendant agreed to have sex with her victims before drugging them with fentanyl and robbing them of their property. (*Id.*). Each victim ingested the fentanyl provided by the defendant and died because of their use of the defendant's drugs. (*Id.*)

i. *Distribution of Fentanyl that Caused the Death of Mario Paullan (Count One)*

On or about the evening of April 30, 2023, Mario Paullan and another victim (Paullan's former brother-in-law) met the defendant outside of a laundromat in upper Manhattan. (PSR ¶ 11). The defendant approached Paullan and his former brother-in-law and offered to sell them laundry detergent in an apparent ruse. (*Id.*). The defendant continued to speak with Paullan outside of the laundromat and, after some discussion, led Paullan and the other victim to a nearby vacant apartment to have sex for money. (*Id.*). While inside of the vacant apartment, the defendant provided Paullan and the other victim with fentanyl to incapacitate them so she could rob them. (*See* PSR ¶¶ 15-22). Paullan and his former brother-in-law were both poisoned as a result of ingesting the defendant's fentanyl; Paullan died, and his former brother-in-law survived. (PSR ¶¶ 15, 22).

During Paullan's encounter with the defendant inside the vacant apartment, Paullan recorded a video (the "Video") on his cellphone that shows the defendant providing Paullan with what the defendant said was cocaine, but which turned out to be a deadly dose of fentanyl. (PSR ¶ 18). As captured on the Video, Paullan asked the defendant if she was providing him with "perico," which is slang for cocaine. (*Id.*). The Video captured the sound of Paullan snorting and sniffing. (*Id.*). The Video also captured the voice of the defendant continually pushed Paullan to take more of the purported cocaine, even as Paullan told the defendant that he did not want any more. (*Id.*) After Paullan appeared to snort the purported cocaine for approximately a third time under pressure from the defendant, the Video captured the defendant telling Paullan, in sum and substance, that they were going to bed. (PSR ¶ 19). Paullan said, "yes," and the defendant stated, in sum and substance, that one of the victims should go over to her while the other victim waits because she can only handle one of them at a time. (*Id.*). The Video then showed Paullan's former brother-in-law, who was also naked, walking with the defendant into another room followed by Paullan, who was still recording the Video. (PSR ¶ 20). The Video ended shortly thereafter. (*Id.*).

Sometime after ingesting the fentanyl, Paullan's brother-in-law fell unconscious. (PSR ¶¶ 14-15). The next morning, Paullan's former brother-in-law woke up inside the vacant apartment feeling as though he had been drugged and found that his cellphone was missing as well as the

cash he had in his wallet.[1] (PSR ¶ 15). He also found Paullan unresponsive on the floor. (PSR ¶ 16). The defendant, however, was gone. (PSR ¶ 14). Paullan's brother-in-law then left the vacant apartment in search of help; a short time later, police arrived at the vacant apartment and found Paullan dead. (PSR ¶¶ 16-17). Paullan's cause of death was determined to be acute intoxication from alcohol and fentanyl, with exposure to fentanyl being the ultimate cause of his death. (PSR ¶ 22). There was no trace of cocaine found in Paullan's system at the time of his death. (*See* PSR ¶ 22).

The evidence gathered in this case also establishes that the defendant was the one who stole Paullan's former brother-in-law's cellphone from inside the vacant apartment on the same night that she drugged the two men. (PSR ¶ 23). Specifically, cellsite location data obtained for Paullan's former brother-in-law's cellphone shows that by 1:58 a.m. on May 1, 2023, which was only approximately two hours after the defendant pressured Paullan to unwittingly take fentanyl, the cellphone was outside of the vacant apartment and being used to call and text phone numbers that belonged to the defendant's family and friends. (*See id.*). The defendant continued to use that stolen cellphone until about the end of May 2023.

A photograph that depicts where law enforcement officers found Paullan's body when they entered the vacant apartment is included as Exhibit A to the Government's sentencing submission.[2]

### ii. *Distribution of Fentanyl that Caused the Death of Miguel Angel Navez Ramirez*

Approximately five months after killing Paullan, the defendant drugged and robbed a second male victim—Miguel Angel Navez Ramirez—who died from ingesting the drugs the defendant gave him.

Specifically, on or about September 29, 2023, the defendant distributed a substance that contained fentanyl to Navez Ramirez at his apartment in upper Manhattan during a sexual encounter with Navez Ramirez. (PSR ¶ 24). During that encounter, the defendant also robbed Navez Ramirez of items including his cellphone and tablet. (*Id.*). Later that same day, a roommate of the defendant used the cellphone the defendant had stolen from Navez Ramirez to call 911 and report that the defendant was having an asthma attack inside an apartment that the roommate shared with the defendant. (*Id.*). The next day—September 30, 2023—the defendant used Navez Ramirez's cellphone to call her drug dealer and her mother. (*Id.*).

Also on September 30, 2023, Navez Ramirez was found unresponsive on his bed by his brother, who had gone to Navez Ramirez's apartment to conduct a wellness check on the victim. (PSR ¶ 25). Navez Ramirez's door, which was usually locked from the inside, was unlocked, and

---

[1] Later that same day, Paullan's former brother-in-law began vomiting uncontrollably and had to be taken to the hospital and given intravenous fluids. (PSR ¶ 15).

[2] Because the exhibits attached to the Government's sentencing submission are very graphic in nature and depict the victims of this crime in highly vulnerable states, the Government respectfully requests that the exhibits be maintained under seal so as not to undermine the privacy rights of the victims.

Navez Ramirez was in his bed with his pants at his knees and a drug wrapper laying on the bed next to his body. (*Id.*). Emergency medical personnel arrived at Navez Ramirez's apartment shortly thereafter and found Navez Ramirez dead on his bed. (*Id.*). Navez Ramirez's cause of death was determined to be acute intoxication from fentanyl and alcohol. (*Id.*)

A photograph that depicts where Navez Ramirez was found at the time of his death is included as Exhibit B to the Government's sentencing submission.

### iii. Distribution of Fentanyl that Caused the Death of Abrihan Rofer Fernandez Rodriguez (Count Two)

Then, approximately five months after the defendant killed Navez Ramirez, the defendant drugged and robbed a third male victim—Abrihan Rofer Fernandez Rodriguez—who, just like Paullan and Navez Ramirez, died from ingesting the drugs that the defendant gave him.

Specifically, at approximately 4 a.m. on February 25, 2024, Rodriguez met the defendant on the street not far from his apartment in upper Manhattan. (PSR ¶ 27). Rodriguez was returning home from a night out with a friend when the defendant spotted him walking down the street alone. (*Id.*). The defendant followed Rodriguez until she caught up to him. (*Id.*). The defendant then engaged Rodriguez in conversation. (*Id.*). The defendant and Rodriguez continued to walk, talk, and smoke together until they reached Rodriguez's apartment. (*Id.*). The defendant accompanied Rodriguez inside of his apartment where the defendant provided Rodriguez with fentanyl before robbing him. (*Id.*).

A few hours after entering his apartment, the defendant emerged from Rodriguez's apartment with a bag. (PSR ¶ 28). She left Rodriguez's building but placed something inside the door to the apartment to ensure that she was not locked out. (*Id.*). She went out and purchased food. (*Id.*). While she was outside of Rodriguez's apartment, she made a call for a car service from a nearby kiosk. (*Id.*). Then, the defendant returned to Rodriguez's apartment and proceeded to remove several bags from the apartment, including a backpack that Rodriguez had been wearing when he met the defendant earlier that morning. (*Id.*).

Later that same day, the defendant arrived at her apartment building with the bags she had removed from Rodriguez's apartment. (PSR ¶ 29). The defendant's son helped her with the bags and was seen removing pairs of Rodriguez's sneakers from the bags and bringing them into the defendant's apartment. (*Id.*). The defendant also stole Rodriguez's credit cards, which the defendant's son was captured on video using the next day, and cellphone. (*Id.*).

At approximately 9 p.m. that same night, Rodriguez's roommate arrived home, checked on Rodriguez, and found him unresponsive on his bed. (PSR ¶ 30). Emergency medical personnel arrived at Rodriguez's apartment shortly thereafter and found Rodriguez dead on his bed. (*Id.*). Rodriguez's cause of death was determined to be acute intoxication from fentanyl, fluorofentanyl, and acetylfentanyl. (*Id.*).

A photograph that depicts where Rodriguez was found at the time of his death is included as Exhibit C to the Government's sentencing submission.

          *iv. Bundrick Had Stolen Nearly Twenty Other Cellphones in the Six Months Leading Up to Paullan's Death*

While the incidents involving Paullan, Navez Ramirez, and Rodriguez are the only confirmed cases of Bundrick's deadly conduct, her pattern of drugging and robbing men may well have started six months before she killed Paullan. Specifically, between November 2022 and January 2023, Bundrick sold or attempted to sell 19 different cellphones to a second-hand cellphone dealer in her neighborhood. For fifteen of those cellphones, the defendant received less than $20 each in return. Given Bundrick's pattern of stealing cellphones, the fact that Bundrick sold all 19 of those cellphones within only a three-month period shortly before she drugged and robbed Paullan, and the fact that she received little to no money for most of the cellphones she resold (and, therefore, her acts were quite obviously not part of some arbitrage scheme), the most likely conclusion is that Bundrick stole those cellphones from other victims as well.

    **B. Guilty Plea and Applicable Guidelines**

On February 25, 2025, the defendant pleaded guilty, pursuant to a plea agreement (the "Plea Agreement"), to one count of distributing and possessing with intent to distribute mixtures and substances containing a detectable amount of fentanyl and cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(C), and one count of distributing and possessing with intent to distribute mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(C). (PSR ¶¶ 4, 58). The Plea Agreement between the parties stipulated that the drugs Bundrick distributed to the three different victims discussed above—Paullan, Navez Ramirez, and Rodriguez—caused their death. (PSR ¶ 5). The Plea Agreement also stipulated that a Guidelines Range of 210 to 262 months' imprisonment applied to the defendant's conduct. That Guidelines Range was based on an offense level of 37, which included a two-level increase based on a grouping analysis that treated both counts of conviction as separate groups and factored in a three-point reduction for acceptance of responsibility, and a criminal history category of I. (PSR ¶ 5).

The Probation Office disagrees with the parties' Guidelines calculation. (*See* PSR ¶¶ 36-51, 92). The Probation Office calculated the defendant's offense level as 35 rather than 37, because, according to the Probation Office, the offenses charged in Counts One and Two are to be treated as a single group rather than two separate groups pursuant to U.S.S.G. § 3D1.2(d). Under the Probation Office's calculations, with an offense level of 35 and a criminal history category of I, the Guidelines range applicable to the defendant is 168 to 210 months' imprisonment rather than 210 to 262 months' imprisonment.[3] (*See id.*).

---

[3] The Government acknowledges that § 3D1.2(d) specifically lists offenses covered by § 2D1.1 of the Guidelines (which includes the offenses committed by the defendant) as ones that should be grouped together for purposes of calculating the Guidelines. The Government maintains, however, that it is more appropriate to treat both counts of conviction as separate groups because the offense level here is not determined by the quantity of a substance involved, as called for under § 3D1.2(d), but rather by the fact that two different victims died as a result of ingesting drugs distributed by the defendant on two different occasions that occurred during the course of two different robberies nearly ten months apart. *See* U.S.S.G. § 3D1.2, Background ("Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in

## II. Discussion

### A. Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)–(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. *The Court Should Impose a Sentence of 30 Years In Prison*

The Government respectfully submits that an above-Guidelines sentence of 30 years' imprisonment is sufficient, but not greater than necessary, to serve the purposes of sentencing, particularly in light of (i) the seriousness of the defendant's conduct and the need to provide just punishment for the offense, (ii) the need for specific deterrence and the need to protect the public, and (iii) the need for general deterrence and to promote respect for the law.

---

distinct transactions, so that each such count should be treated separately rather than grouped together."); *but see id.* ("Counts involving different victims . . . are grouped together only as provided in subsection (c) or (d).").

*First*, a sentence of 30 years' imprisonment is necessary to reflect the seriousness of the defendant's conduct and the need to provide just punishment for the offense.

The seriousness of the defendant's conduct and the need to provide just punishment for her offenses cannot be overstated. In a period of only ten months, the defendant killed three innocent victims: Paullan, Navez Ramirez, and Rodriguez. She killed those victims by luring them into sexual encounters and then intentionally providing them with fentanyl to incapacitate them so that she could rob them. She did that knowing that fentanyl could kill those victims, and she continued to do it after she knew that her victims were, in fact, dying. It is only by sheer luck that Paullan's former brother-in-law also did not die from a fentanyl overdose, otherwise the defendant would have killed four victims in as much time.[4]

The defendant's conduct is tantamount to murder.[5] She acted with complete indifference to human life by drugging men with a deadly substance (i.e., fentanyl), and those men died because they ingested the defendant's drugs. Her actions against Paullan, Navez Ramirez, and Rodriguez (and Paullan's former brother-in-law, for that matter) were cruel, unnecessary, and inhuman, and they destroyed each victim's family. Statements made by Paullan's family members underscore the conclusion that a 30-year sentence is necessary to ensure just punishment for the defendant. For example:

- Paullan's wife has stated the following: "Mario was the love of my life. I love him and miss him deeply. Now, facing life alone[,] having to be both a mother and father, working tirelessly from Sunday to Sunday, it is very hard for me to hold myself together emotionally and financially. It hurts not being able to be there for my children the way I wish I could. Our youngest daughter . . . who is just four years old, she asks me to take her to heaven to give her

---

[4] To be clear, there is no reasonable dispute that the defendant knew that fentanyl is deadly or that her victims were dying after she drugged them. First, it is common knowledge that fentanyl is a deadly substance even in very small doses; but, even if it were not, the defendant is a sophisticated, long-term drug user who is highly knowledgeable about drug use. Second, as the photographs provided in Exhibits A, B, and C show, it is clear by the way these victims were found that any reasonable person would have known they were dead if they were in the defendant's position.

[5] The Model Penal Code describes "depraved-heart murder," which is a category of murder, as follows: "This label derived from decisions and statutes condemning as murder unintentional homicide under circumstances evincing a 'depraved mind' or an 'abandoned and malignant heart.' Older authorities may have described such circumstances as giving rise to an 'implied' or 'presumed' intent to kill or injure, but the essential concept was one of extreme recklessness regarding homicidal risk. Thus, a person might be liable for murder absent any actual intent to kill or injure if he caused the death of another in a manner exhibiting a 'wanton and willful disregard of an unreasonable human risk' or, in confusing elaboration, a 'wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty.'" Amer. Law Inst., Model Penal Code and Commentaries, § 210.2 cmt. 1.

- dad a gift for Father's Day. I have no words to explain to her that she will never see him again."

- Paullan's son has said the following: "My Dad's death has been the hardest blow life has given me. I felt like my world collapsed. He told me I had to be the man of the house, to take care of my mother and sister. Now, even though I feel broken inside, I dry my tears so I can hold them and tell them everything will be okay."

- Paullan's brother has stated the following: "Mario was the best brother life could have given us. He was always looking out for us, caring for and protecting us. In the hardest times, he would rather let us eat than eat himself. His loss has especially affected my mother and our sister . . . who is battling cancer. They shared the shared the same birthday, and now what used to be a joyful day has become one of sadness. My mother wakes up at night thinking he is still with us, and when she realizes it was only a dream, she cries in despair."

In her sentencing submission, the defendant tries to minimize the seriousness of her own conduct and portray herself as a victim. She suggests that all she was doing was sharing drugs with the victims, which she herself was also taking so that she could get through her sexual encounter with her victims. That is entirely untrue. First, the evidence establishes that the defendant was the one who sought out the victims and not the other way around. She initiated the contact with Paullan and his former brother-in-law and led them to the vacant apartment. She also saw, tracked down, and initiated the contact with Rodriguez who was merely walking home after a night out with a friend. Second, there is no evidence whatsoever supporting the fact that the defendant took the same drugs she gave to the victims. Quite the opposite. The Video depicts the defendant lying to Paullan about what drug she was giving him (telling him it was cocaine when it was actually pure fentanyl) and pressuring Paullan to take more and more hits of the fentanyl. The evidence also establishes that the defendant walked away from each encounter unscathed, while the victims (especially Paullan and Rodriguez) died quickly from large doses of fentanyl. Third, the defendant robbed each victim she gave drugs too. Those facts alone undermine the notion that all the defendant wanted to do was share drugs with her victims.

For all those reasons, the defendant's actions amount to reprehensible criminal conduct that warrants a sentence of 30 years' imprisonment.

*Second*, the need for specific deterrence and the need to protect the public from the defendant also support a 30-year sentence. It is hard to fathom that someone would actually administer deadly doses of fentanyl to unsuspecting victims in order to rob them of their cellphones, tablets, and sneakers. It seems almost too wicked to be real. But the defendant did that not just once, not just twice, but at least three times in less than a year. Her willingness to repeatedly engage in such evil behavior is, even in the absence of any criminal history, evidence that the defendant needs to be removed from society for a very long period to ensure the safety of the community.

What is more, the defendant has failed to take responsibility for the totality of her actions. At her plea colloquy, (*see* PSR ¶ 35), and again in her sentencing submission, (*see* Def. Sentencing Submission at 1, 6-7), the defendant admitted only to "sharing" drugs with her victims and to believing that the drugs she gave her victims was cocaine. She has not admitted to drugging her victims to rob them, even though the evidence establishing that conduct is undisputed; and she has not admitted to knowing that the drugs she gave her victims was fentanyl (or lying to her victims about the type of drug she was giving them) even though no controlled substance other than fentanyl or fentanyl analogues were found in each victim's system at the time of their death. Instead of taking responsibility, the defendant has tried to paint herself as the victim of circumstance and to blame the dealers and suppliers of fentanyl for the deaths she caused. (*See, e.g.*, Def Sentencing Submission at 1 ("[T]his case presents a tragedy for everyone involved, including Ms. Bundrick herself. . . . For [the victims' families], they have been left with more questions than answers, as they seek to find out who is ultimately responsible the death of their loved ones."); at 8 ("While under the letter of the law, Ms. Bundrick actions in sharing her personal use drugs with others is considered distribution, the dividing line between criminal conduct and non-criminal conduct is extremely thin."); at 9 ("[T]he men who tragically overdosed in this case were merely unintended victims who were swept up in Ms. Bundrick's spiral of self-destruction.") While fentanyl suppliers are to blame too, it was the defendant who intentionally gave Paullan, Navez Ramirez, and Rodriguez fentanyl to incapacitate them so that she could rob them knowing full well that fentanyl was deadly and was, in fact, killing her victims. She is the one who is responsible for their deaths and her failure to admit that underscores the need for specific deterrence.

In sum, the combination of the depravity of the defendant's conduct and her inability to fully admit to and take responsibility for that conduct demonstrate that a 30-year sentence is necessary to prevent the defendant from engaging in further criminal conduct both from the perspective of deterrence and incapacitation. On the other hand, if the defendant is not given a 30-year sentence, then she may get out of prison at an age where she still poses an extreme danger to the community.

*Third*, a sentence of 30 years' imprisonment is also necessary to ensure adequate general deterrence and promote respect for the law. The offense conduct in this case reflects extraordinarily serious criminal activity that led to the death of three innocent victims and caused lasting trauma to their families. The effect of the defendant's conduct is enormous and far-reaching. It is important that any sentence imposed provide adequate deterrence to those who would engage in such conduct by recklessly using deadly drugs to incapacitate victims in order to rob them.

In addition, a 30-year sentence in a case involving three victims dying of fentanyl overdoses would be in line with other sentences imposed by Courts in this District for somewhat similarly situated defendants in death-resulting cases. For example, in *United States v. Sica*, Judge Siebel sentenced a heroin and fentanyl dealer to 35 years' imprisonment, after he pled guilty on the eve of trial to distributing drugs that caused three deaths, despite knowing of the deadly effects of the drugs he sold. *See United States v. Sica*, 14 Cr. 462 (CS), Dkt. 92 at 40 (Nov. 5, 2015) (Court stating that Sica's "drugs were responsible for the deaths of three people and there was time to stop, there was time to change, and it didn't happen"). In *United States v. Ortega*, Judge Abrams sentenced the leader of a drug trafficking organization to 30 years' imprisonment following a trial

in which he was found guilty of distributing fentanyl-laced cocaine that resulted in three deaths. *See United States v. Ortega*, 22 Cr. 91 (RA), Dkt. 177 at 68 (Oct. 4, 2023). And most recently, Judge Rakoff sentenced a member of a drug trafficking organization who was using a daycare in the Bronx to store its fentanyl, resulting in the fatal fentanyl poisoning of a young child, to 45 years' imprisonment following a guilty plea shortly before trial. *See United States v. Herrera Garcia, et al.*, 23 Cr. 504 (JSR), Dkt. 110 (Oct. 18, 2024). While the *Herrera Garcia* case involved the tragic death of a child and the brazen use of a daycare to run a drug operation, and is thus different in kind than the conduct at issue here, the sentence in that case is nonetheless instructive because it is yet another example of Courts in this District imposing decades-long sentences for individuals who, like the defendant, distrusted fentanyl in blatant disregard for its horrific consequences.

*Finally*, in her sentencing submission, the defendant asks the Court for an unconscionably low sentence of ten years' imprisonment. That sentence is close to twelve years below the top end of the applicable Guidelines range, and there is no justification for such a massive variance. Nevertheless, the defendant points to several factors including her upbringing and alleged learning disability, her time spent at MDC, and the nature of her conduct as purported justifications for a downward variance. None of those factors justify a sentence that will keep the defendant in prison for anything less than 30 years.

*First*, the defendant argues that her difficult upbringing—including economic hardship, sexual abuse, a learning disability, and bullying as a child—is a mitigating factor that justifies a severely below Guidelines sentence. (Def. Sentencing Submission at 8-9). She is mistaken. While the defendant's difficult childhood could be considered tragic, her conduct in this case perpetuated the destructive effects that plagued his own childhood. Rather than turn away from the abuse she experienced growing up and seek help for her learning disability, the defendant became a predator herself who preyed on men for her own financial gain. The defendant's upbringing and learning disability cannot justify the harm she inflicted on Paullan, Navez Ramirez, Rodriguez, and their families, and a sentence of 30 years' imprisonment is necessary to protect the public from her depraved behavior.

*Second*, the defendant argues that such a variance is warranted because she has completed various programs while dealing with the conditions at the MDC. (Def. Sentencing Submission at 10-12). While completion of these programs is, in some small sense, a positive development, it does not justify a ten-year sentence given the seriousness of the defendant's conduct and her unwillingness to take full responsibility for her actions, as described above. In addition, the conditions at MDC also do not justify a sentence below 30 years' imprisonment. While the MDC has, at times, had challenges, the Government does not agree that the conditions are inhumane, as the defendant claims. While the defendant complains about frequent "lockdowns" and other issues, she was not incarcerated at the MDC in 2020 or early 2021, at the height of the COVID-19 pandemic where there were more frequent lockdowns; moreover, every case the defendant cites for the proposition that the conditions at MDC are a strong mitigating factor is from 2020 and 2021, save for Judge Furman's opinion in *United States v. Chavez*, 22 Cr. 303 (JMF). And even when defendants were incarcerated at the height of the pandemic, courts found that the conditions at the MDC did not warrant "significant Guidelines departure[s]" requested by defendants. *See United States v. Stewart,* No. 21 Cr. 42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22,

2023); *see also, e.g.*, *United States v. Sanchez*, No. 01 Cr. 74-2 (PAC), 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022) (finding, in context of compassionate release motion, that "the difficult—but generalized—prison conditions during the COVID-19 pandemic" do not constitute extraordinary and compelling circumstances for a defendant's release); *United States v. Boynton*, No. 20 Cr. 43 (RPK), 2022 WL 7131927, at *1 (E.D.N.Y. Oct. 12, 2022) (collecting cases to same effect).

Furthermore, the conditions at MDC have improved significantly over time. Indeed, at a bail hearing in January of this year, Judge Caproni—who is deeply engaged in the issues at MDC, including attending regular meetings about MDC with the Bureau of Prisons, the Federal Defenders, and the US Attorney's Offices for the Southern and Eastern Districts of New York— stated the following about arguments like that of the defendant:

> Let me just say, to all of the: MDC is a horrible place, and it's awful, and they're going to be locked down forever, that's just not true anymore. All of those decisions that you read about were months ago. There's a lot more staffing at the MDC. The number of defendants who are ending up in lock down for substantial periods of time are minimal. . . . MDC -- look, it's a jail. But the horror stories from a year ago are just – it's not the facility. They have put a lot more staff on. They've got a lot more medical staff, and they're doing the best they can.

(Transcript from January 16, 2025 appearance in *United States v. Alon Alexander et al.*, 24 Cr. 676 (VEC) at 125). In light of the way in which the conditions at MDC are improving, the Court should decline the defendant's invitation to significantly reduce her sentence.

*Third*, the defendant asks the Court for a ten-year sentence because, in her view, the Controlled Substances Act "was never intended to punish severally such commonplace conduct"— that is, sharing of personal use drugs. (Def. Submission at 2; *see also id*. at 8). This argument fails for all the reasons discussed above, including that the defendant did not just *share* personal use drugs with the victims. She intentionally provided the victims with fentanyl to incapacitate them so that she could rob them, which caused their deaths. That conduct is even more serious than the mere distribution of fentanyl; it is, by all accounts, murder.

The Government submits that a sentence of 30 years' imprisonment is sufficient but not greater than necessary to account for the seriousness of the defendant's conduct, the need to provide just punishment for the offense, the need for specific deterrence, the need to protect the public, the need for general deterrence, and the need to promote respect for the law. The defendant killed three victims by intentionally providing them with fentanyl to incapacitate them so that she could rob them. She did so knowing that the fentanyl she provided her victims could kill them and that the men she was giving fentanyl to were, in fact, dying. Nothing short of a 30-year sentence will be adequate to protect society from so dangerous an offender.

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose an above-Guidelines sentence of 30 years' imprisonment.

Very truly yours,

JAY CLAYTON
United States Attorney

by: _____
Matthew J. King
Assistant United States Attorneys
(212) 637-2384

cc:   Kristoff Williams, Esq. (by ECF)